1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11 | RICKEY A. BEAVER,

12 |         Plaintiff,

13 |     v.

14 | JUDY HOBDY, *et al.*,

15 |         Defendants.

CASE NO.  C05-210JCC

REPORT AND RECOMMENDATION

16

<u>INTRODUCTION AND SUMMARY CONCLUSION</u>

17

18

19

20

21

22

23

24

      Plaintiff is a state prisoner who is currently confined at the Western State Hospital at Steilacoom, Washington.  He brings this action under 42 U.S.C. § 1983 seeking monetary damages for alleged violations of his constitutional rights during his incarceration at the King County Regional Justice Center ("RJC").  Plaintiff names the following King County employees as defendants in this action: Judy Hobdy, Assistant Personal Health Services Supervisor; Debbie Nanson, Personal Health Services Supervisor; Katherine Jones, Corrections Sergeant; Ron Kintner, Corrections Program Specialist; and, Susan Belt, Corrections Program Supervisor for Classification.

25

26

REPORT AND RECOMMENDATION
PAGE - 1

1    Plaintiff previously filed a motion for summary judgment which was denied by the Court.

2  Defendants now move for summary judgment.  Plaintiff opposes defendants' motion.  Following a

3  careful review of defendants' motion, plaintiff's response thereto, and the balance of the record, this

4  Court concludes that defendants' motion for summary judgment should be granted in part and denied

5  in part.

6                                                    FACTS

7    Plaintiff was booked into the RJC on August 27, 2004.  (Dkt. No. 16 at 3; Dkt. No. 65 at 2.)

8  On the following day, plaintiff was seen by a registered nurse for evaluation of physical injuries

9  plaintiff had when he was booked into the jail.  (*Id.*)  Plaintiff advised the nurse at that time about his

10  mental health condition.  (*Id.*)  Plaintiff also advised the nurse that he had previously been prescribed

11  both Zoloft and Trazadone as a part of a mental health treatment plan.  (*See id.*)

12    Plaintiff contends that even after advising the nurse of his mental health condition at the time

13  of his booking, he was not seen by a jail psychiatrist, and did not receive the medications he required,

14  until September 30, 2004.  (Dkt. No. 16 at 3.)  However, documents submitted by defendants in

15  support of their summary judgment motion establish that plaintiff was seen by psychiatrist David

16  Kersey, M.D., on September 3, 2004, and that Dr. Kersey prescribed Zoloft and Trazadone for

17  plaintiff at that time.  (Dkt. No. 65, Ex. 1.)  The documents submitted by defendants further establish

18  that plaintiff began taking the Trazadone on September 4, 2004, and that he began taking the Zoloft

19  on September 5, 2004.  (*Id.*, Ex. 2.)

20    Plaintiff states that on approximately October 15, 2004, he began experiencing agitation and

21  anxiety, and that he began seeing shadows and hearing voices.  (Dkt. No. 16 at 3.)  Plaintiff asserts

22  that he sent a kite to medical at about that time requesting to be seen by the psychiatric department,

23  but that he received no response to the kite.  (*Id.*)  Plaintiff further asserts that he thereafter spoke to

24  a nurse who advised him to file a grievance with defendant Hobdy.  (*Id.*)  The record appears to

25

26  REPORT AND RECOMMENDATION
    PAGE - 2

1   indicate that defendant Hobdy received plaintiff's grievance on November 12, 2004, and that she sent

2   a response to plaintiff on November 16, 2004, indicating that she had made an appointment for him

3   at the psychiatric clinic.  (Dkt. No. 16 at 13.)

4         On the morning of November 22, 2004, plaintiff was transported to the King County

5   Correctional Facility ("KCCF") in Seattle for his scheduled appointment.  (Dkt. No. 16 at 5; Dkt. No.

6   65 at 3.)  However, plaintiff was not seen on that date, apparently because of an administrative error,

7   and he was transported back to the RJC later that afternoon.  (*Id.*)  On November 23, 2004, jail

8   psychiatric services sent plaintiff a memo apologizing for the confusion regarding his previous clinic

9   visit and advising him that an appointment with the psychiatrist had been scheduled for November

10  30, at KCCF.  (Dkt. No. 16 at 14.)  On November 30, 2004, plaintiff was once again transported to

11  KCCF and, once again, the appointment did not take place.  (Dkt. No. 16 at 5; Dkt. No. 65 at 3.)

12  Upon returning to the RJC, plaintiff filed a grievance with defendant Nanson.  (Dkt. No. 16 at 22.)  It

13  appears that a response to that grievance was sent to plaintiff on December 6, 2004, advising that

14  plaintiff would be seen by a psychiatrist at the RJC on an undisclosed date.  (*Id.*)

15        On December 10, 2004, while still waiting to be seen by the psychiatric department, plaintiff

16  was moved to a different housing unit, apparently because of population changes at the RJC.  (*See*

17  Dkt. No. 67, Ex. 1 at 2.)  Plaintiff asserts that after being moved to the new unit, he experienced a

18  panic attack with auditory and visual hallucinations.  (Dkt. No. 16 at 6.)  Plaintiff refused to allow

19  the corrections officer to close his door and, as a result of plaintiff's refusal to "rack back," a code

20  blue emergency was called by the corrections officer.  (Dkt. No. 68, Ex. 1.)  Plaintiff was thereafter

21  handcuffed and transported to pre-disciplinary housing.  (Dkt. No. 67 at 2.)

22        During the course of his transport to pre-disciplinary housing, plaintiff contends that he began

23  to experience chest pain, which caused him to slow his pace, and that he then began to sob

24  uncontrollably.  (Dkt. No. 16 at 7.)  Plaintiff asserts that defendant Jones told him to "shut up" and

25

26  REPORT AND RECOMMENDATION
    PAGE - 3

1   threatened to pepper-spray him.  (Dkt. No. 16 at 7.)  Plaintiff then told defendant Jones that he would

2   sue her for excessive and unnecessary use of force if she pepper-sprayed him.  (*Id*.)  Plaintiff

3   contends that as soon as he threatened to sue defendant Jones, she had the escorting officers push

4   plaintiff against the wall and she then pepper-sprayed him in the face.  (Dkt. No. 16 at 7-8.)

5          Defendant Jones' version of these events differs slightly from plaintiff's.  Defendant Jones

6   states that while plaintiff was being transported to pre-disciplinary housing, he clenched his fists and

7   attempted to resist.  (Dkt. No. 67 at 2.)  One of the escorting officers, Officer Fiechtner, asked

8   plaintiff on two occasions if he was alright, but plaintiff did not respond.  (*Id*.)  Plaintiff then started

9   to turn towards Officer Fiechtner.  (*Id*.)  According to defendant Jones, plaintiff was then placed

10  against the wall in the hallway where she instructed him to calm down and advised him that he would

11  be pepper-sprayed if he continued to resist.  (*Id*. at 2-3.)  Plaintiff threatened to sue the officers if he

12  was pepper-sprayed, but the escort continued down the hallway.  (*Id*. at 3.)  Defendant Jones states

13  that plaintiff then attempted to resist again and that she administered a short burst of pepper spray to

14  plaintiff's face.  (*Id*.)  When plaintiff refused to comply with another directive of defendant Jones,

15  and continued to resist, she administered another burst of pepper spray to plaintiff's face in order to

16  gain compliance.  (*Id*.)  Plaintiff thereafter complied with officers' directives.  (*Id*.)

17         After plaintiff was pepper-sprayed, he was turned around and escorted backwards by officers

18  to pre-disciplinary housing.  (Dkt. No. 16 at 8; Dkt. No. 67 at 3.)  Plaintiff asserts that he was

19  dragged  down the hallway and then up a flight of stairs backwards, and that he sustained injuries to

20  his hands, arms, and ankles during this process.  (Dkt. No. 16 at 8.)  Defendant Jones states that

21  plaintiff was "assisted up" the steps and placed in his cell, and that a jail health nurse was

22  immediately summoned in order to decontaminate plaintiff of the pepper spray.  (Dkt. No. 67 at 3.)

23  The jail health nurse decontaminated plaintiff and cleared him to remain in general population.  (*See*

24  Dkt. No. 65, Ex. 4.)  According to defendant Jones, plaintiff had no visible injuries, nor did he

25

26  REPORT AND RECOMMENDATION
    PAGE - 4

1  complain of any injuries, when officers left him in his cell.  (Dkt. No. 67 at 3.)  The medical notes of

2  the nurse who responded indicate that plaintiff's eyes were flushed with water and that he stated he

3  was otherwise "alright."  (Dkt. No. 65, Ex. 4.)  The nurse noted, however, that plaintiff was visibly

4  upset.  (*Id.*)

5      As a result of his behavior on December 10, 2004, plaintiff was infracted for resisting, for

6  refusing orders resulting in an emergency response, and for refusing placement.  (Dkt. No. 68 at 2.)

7  Plaintiff's disciplinary hearing was conducted on December 13, 2004, by defendant Kintner.  (*Id.*)

8  Defendant Kintner found plaintiff guilty of refusing orders resulting in an emergency response,

9  apparently based upon plaintiff's own written statement.  (*See id.*, and Ex. 3.)  Defendant Kintner

10  then found plaintiff guilty of the other charges and imposed a sanction of ten days in disciplinary

11  segregation and five days loss of good time.  (Dkt. No. 68, Ex. 3.)  Plaintiff appealed the decision of

12  defendant Kintner and, on December 14, 2004, defendant Belt upheld the decision of defendant

13  Kintner.  (Dkt. No. 69 at 2.)

14      On December 16, 2004, plaintiff was finally seen again by Dr. Kersey.  (Dkt. No. 16 at 11;

15  Dkt. No. 65 at 3 and Ex. 3.)  At that time, Dr. Kersey apparently diagnosed plaintiff with post

16  traumatic stress disorder and prescribed an additional medication for plaintiff to take along with the

17  Zoloft and Trazadone.  (*Id.*)  Defendant Nanson states that Dr. Kersey continued to see plaintiff

18  approximately monthly throughout the remainder of his incarceration at the RJC.  (Dkt. No. 65 at 3.)

19                                    <u>DISCUSSION</u>

20      Plaintiff alleges in his civil rights complaint that medical personnel at the KCCF and the RJC

21  failed to provide him with adequate treatment for his mental health issues.  Plaintiff also alleges that an

22  officer at the RJC used excessive force against him.  Finally, plaintiff alleges that he was denied due

23  process in the context of a prison disciplinary proceeding.  Defendants argue that plaintiff's claims

24  must be dismissed because there are no genuine issues of material fact and they are therefore entitled

25

26  REPORT AND RECOMMENDATION
    PAGE - 5

1    to judgment as a matter of law.

2                        Summary Judgment Standard

3           Summary judgment is proper only where "the pleadings, depositions, answers to

4    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

5    genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

6    law." Fed.R.Civ.P. 56(c).  The moving party has the burden of demonstrating the absence of a

7    genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  And, the

8    court is required to draw all inferences in a light most favorable to the non-moving party.  *Id.* at 248.

9    Genuine disputes are those for which the evidence is such that a "reasonable jury could return a

10   verdict for the nonmoving party."  *Id.*  Material facts are those which might affect the outcome of the

11   suit under governing law.  *Id.*

12                          Inadequate Medical Care

13          Plaintiff asserts in his complaint that defendants Judy Hobdy and Deborah Nanson, who both

14   held supervisory positions involving management and oversight of inmate health services at the RJC

15   at times relevant to the complaint, violated his Eighth Amendment right to adequate medical care.

16   The record makes clear that neither of these defendants provided any direct care to plaintiff.  Plaintiff

17   does not allege to the contrary.  Instead, plaintiff appears to assert that because these two individuals

18   were aware of plaintiff's mental health issues, and oversaw his concerns and complaints regarding

19   his mental health care, they may be held liable for the failure of jail health employees to provide

20   plaintiff with adequate mental health treatment.

21          The Eighth Amendment imposes a duty upon prison officials to provide humane conditions

22   of confinement.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  This duty includes ensuring that

23   inmates receive adequate medical care.  *Id.*  Because plaintiff was a pretrial detainee at the time of

24   the alleged harm, his claims arise under the Due Process Clause of the Fourteenth Amendment.

25
     REPORT AND RECOMMENDATION
26   PAGE - 6

1   *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996).  Eighth Amendment standards are, however,

2   still applicable to his claims.  *See Carnell*, 74 F.3d at 979.  In order to establish an Eighth

3   Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a

4   subjective component.  The Eighth Amendment standard requires proof that (1) the alleged

5   wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the

6   prison official acted with a sufficiently culpable state of mind.  *Farmer*, 511 U.S. at 834.

7        The objective component of an Eighth Amendment claim is "contextual and responsive to

8   'contemporary standards of decency'"  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Estelle v.*

9   *Gamble*, 429 U.S. 97, 103 (1976)).  The state of mind requirement under the subjective component of

10  the Eighth Amendment standard has been defined as "deliberate indifference" to an inmate's health or

11  safety.  *Farmer*, 511 U.S. at 834.  Under the "deliberate indifference" standard, a prison official cannot

12  be found liable for denying an inmate humane conditions of confinement unless the official knows of

13  and disregards an excessive risk to inmate health or safety.  *Id.* at 837.  "[T]he official must both be

14  aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

15  and he must also draw the inference." *Id.*

16       The evidence presented by defendants in support of their summary judgment motion

17  demonstrates that defendants' involvement in plaintiff's medical care was limited to scheduling

18  appointments for plaintiff to be seen at the psychiatric clinic.  While at least two of the appointments

19  scheduled by defendants did not occur, there is no evidence that either defendant Hobdy or defendant

20  Nanson is responsible for those failures.  Even assuming defendants Hobdy and Nanson bear some

21  responsibility for these failures, the record is devoid of any evidence demonstrating that either of

22  these defendants acted with a sufficiently culpable state of mind in causing delays in plaintiff's

23  access to necessary medical care.  As plaintiff has not established that the conduct of either defendant

24  Hobdy or defendant Nanson constitutes a violation of his right to adequate medical care, defendants

25

26  REPORT AND RECOMMENDATION
    PAGE - 7

1   are entitled to summary judgment with respect to this claim.

2                                    Excessive Force

3           Plaintiff next alleges in his complaint that defendant Katherine Jones violated his right to be

4   free from cruel and unusual punishment when she pepper-sprayed him while he was being

5   transported by other corrections officers to pre-disciplinary housing on December 10, 2004.  He also

6   alleges that defendant Jones violated his right to be free from cruel and unusual punishment when she

7   told the transporting officers to escort plaintiff backwards, and the officers then dragged him

8   backwards by his wrist and up a set of concrete steps resulting in injuries to his hands, arms and

9   ankles.

10          The United States Supreme Court has made clear that "the Due Process Clause protects a

11  pretrial detainee from the use of excessive force that amounts to punishment."  *Graham v. Connor*,

12  490 U.S. 386, 395 n. 10 (1989).  The Ninth Circuit has determined that "the Fourth Amendment sets

13  the 'applicable constitutional limitations' for considering claims of excessive force during pretrial

14  detention."  *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002) (citing *Pierce v.

15  Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996)).  Thus, plaintiff's claim of excessive force

16  must be evaluated under the Fourth Amendment's objective reasonableness standard.  *Pierce*, 76 F.3d

17  at 1043.

18          In *Graham*, the Supreme Court explained that determining whether a particular use of force

19  was "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality

20  of the intrusion on the individual's Fourth Amendment interests against the countervailing

21  governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotations omitted).  Among the

22  factors that must be considered in evaluating a claim of excessive force are "whether the suspect poses

23  an immediate threat to the safety of the officers or others," and "whether he is actively resisting."

24  *Graham*, 490 at 396.  *See also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir.

25

26  REPORT AND RECOMMENDATION
    PAGE - 8

1    2001).  The Supreme Court made clear in *Graham* that "[t]he 'reasonableness' of a particular use of

2    force must be judged from the perspective of a reasonable officer on the scene rather than with the

3    20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

4         Defendants argue in their summary judgment motion that defendant Jones used reasonable

5    force when she applied pepper spray to gain plaintiff's compliance during the December 10, 2004,

6    incident.  Defendants contend that during plaintiff's transport to pre-disciplinary housing, he began to

7    clinch his fists and refuse transport, and he turned toward an officer in a potentially aggressive manner.

8    Defendants assert that this behavior necessitated the use of pepper spray to gain compliance.

9    Defendants further assert that when plaintiff persisted in his refusal to comply with a directive from

10   defendant Jones, she applied another burst of pepper spray to plaintiff's face to gain compliance.

11   Defendants maintain that no other or additional force was used on plaintiff by defendant Jones or by

12   any other officer.

13        Defendants have offered in support of their summary judgment motion the declaration of

14   defendant Jones which has attached to it a copy of the Supervisors Incident Report completed by

15   defendant Jones following the December 10, 2004, incident.  (Dkt. No. 67.)  Also included in the

16   record before this Court are reports from four of the other five officers involved in the transport of

17   plaintiff to pre-disciplinary housing.  Three of the four reports, those of Officers Essang-Ekpo, Terry,

18   and Redman, specifically state that plaintiff was resisting transport.  (*See* Dkt. No. 68, Ex. 2 at 4, 5,

19   and 7.)  The fourth report, that of Officer Fowler, states that plaintiff "tensed up" and "became

20   agitated and started cursing and yelling that he was going to sue us."  (*Id.*, Ex. 2 at 3.)   Notably

21   absent from the record is any report of Officer Feichtner, the officer who apparently attempted to

22   communicate with plaintiff during the transport and the officer whom defendant Jones asserts

23   plaintiff turned towards in a "potentially aggressive manner."

24        While plaintiff concedes that he was emotionally upset, he appears to deny that he was

25

26   REPORT AND RECOMMENDATION
     PAGE - 9

1   physically resisting officers' efforts to transport him.  Plaintiff asserts in his complaint that he began

2   to slow his pace during the transport when he started experiencing chest pain, and that he then began

3   to sob uncontrollably.  (Dkt. No. 16 at 7.)  Plaintiff attributes this emotional outburst to his inability

4   to obtain necessary care for his mental health issues.  (*Id*.)  Plaintiff maintains that defendant Jones

5   told him to "shut up" and threatened to pepper-spray him.  (*Id*.)  According to plaintiff, when he, in

6   turn, told defendant Jones that he would sue her for unnecessary use of force if she pepper sprayed

7   him, she immediately had the escorting officers push plaintiff up against a wall while she pepper-

8   sprayed him.  (*Id*. at 7-8.)

9          In his response to defendants' summary judgment motion, plaintiff contends that the officers

10  present in the hallway during this incident described him only as looking at one of the officers and

11  not as posing a threat to himself or others.  (Dkt. No. 70 at 3.)  Plaintiff also contends that he was not

12  placed against the wall for looking toward one of the officers, as defendant Jones states in her

13  declaration, but was instead placed against the wall for telling defendant Jones that he would sue her

14  if she pepper-sprayed him for no reason.  (*Id*. at 4.)

15         While the record before this Court makes clear that plaintiff was upset during his transport to

16  pre-disciplinary housing, and that he engaged in a verbal altercation with defendant Jones, the Court

17  questions whether plaintiff, who was handcuffed behind his back at the time of the incident, posed an

18  immediate threat to the safety of the transporting officers or to others.  The Court also questions the

19  extent to which plaintiff may have been "actively" resisting at the time he was pepper-sprayed.

20  Accordingly, to the extent plaintiff contends that defendant Jones used excessive force against him

21  when she pepper-sprayed him on December 10, 2004, this Court concludes that defendants' motion

22  for summary judgment should be denied.

23         However, to the extent plaintiff contends that defendant Jones violated his constitutional

24  rights when she directed the transporting officers to escort plaintiff backwards, defendant Jones is

25

26  REPORT AND RECOMMENDATION
    PAGE - 10

1   entitled to summary judgment.  Plaintiff asserts that after defendant Jones directed the transporting

2   officers to turn him around, the officers dragged him by the wrist and up a flight of steps resulting in

3   injuries to his hands, arms and ankles.  Plaintiff offers as proof of his assertion that he was "dragged"

4   by officers, rather than "escorted," medical records from Western State Hospital dated January

5   through March 2006 which indicate that he has received treatment there for shoulder, knee and ankle

6   pain.

7          The incident in question occurred in December 2004.  Medical records from early 2006 are

8   insufficient to establish a causal connection between the incident and the treatment plaintiff is

9   currently receiving.  Moreover, the record indicates that after plaintiff arrived in pre-disciplinary

10  housing on December 10, 2004, he did not report any injuries, and the nurse who evaluated plaintiff

11  cleared him to remain in general population.  Plaintiff has not demonstrated that he was subjected to

12  excessive force when he was escorted backwards to his cell.  Accordingly, defendant Jones is entitled

13  to summary judgment with respect to that claim.

14                                              Due Process

15         Plaintiff alleges in his complaint that defendant Ron Kintner denied him his right to a fair and

16  impartial disciplinary hearing in violation of his Fourteenth Amendment right to due process.

17  Plaintiff also alleges that defendant Susan Belt violated his due process rights when she upheld

18  defendant Kintner's decision on appeal.

19         More specifically, plaintiff appears to contend that defendant Kintner denied him access to

20  statements which were relied upon to determine his guilt, and that defendant Kintner denied him

21  witnesses who could have helped clarify his mental state at the time of the incident.  Plaintiff also

22  contends that defendant Kintner refused to review medical documents and other evidence which he

23  brought to the hearing in an effort to establish that the incident which gave rise to the disciplinary

24  proceedings was a result of plaintiff being denied adequate mental health treatment.  As to defendant

25

26  REPORT AND RECOMMENDATION
    PAGE - 11

1    Belt, plaintiff contends that she violated his rights when she choose to uphold the wrongdoing of

2    defendant Kintner instead of exercising her authority to correct defendant Kintner's error.

3          Defendants argue in their summary judgment motion that plaintiff was provided with the

4    appropriate amount of due process during his disciplinary hearing and subsequent appeal, and that

5    plaintiff's due process claims must therefore be dismissed.  Defendants rely on the Ninth Circuit's

6    holding in *Toussaint v. McCarthy*, 801 F.2d 1080 (9th Cir. 1986), to support their argument that

7    plaintiff received the process he was due.  In *Toussaint*, the Ninth Circuit specifically found that the

8    Due Process Clause does not require prison officials to provide prisoners with an opportunity to

9    present witnesses in proceedings to determine whether an inmate should be segregated for

10   administrative reasons.  *Toussaint*, 801 F.2d at 1100-01.

11         However, at issue here is not whether plaintiff received the process that was due prior to

12   placement in *administrative* segregation, but whether he received the process he was due in a prison

13   *disciplinary* proceeding.  The Ninth Circuit has made clear that a pretrial detainee has a liberty

14   interest in "freedom from disciplinary confinement without due process," and that the due process

15   requirements for prison disciplinary hearing are those established in *Wolff v. McDonnell*, 418 U.S.

16   539 (1974).  *Mitchell v. Dupnik*, 75 F.3d 517, 525 (9th Cir. 1996).  The Ninth Circuit explained in

17   *Mitchell* that "*Wolff* requires that jail authorities allow an inmate who faces disciplinary proceedings

18   and whose liberty interest is threatened to call witnesses in his defense, when permitting him to do so

19   will not be unduly hazardous to institutional safety and correctional concerns."  *Id*.  Thus, while

20   *Wolff* does not require prison officials to afford inmates an unrestricted right to call witnesses, it does

21   require that the decision to preclude the calling of witnesses be made "on a case-by-case analysis of

22   the potential hazards which may flow from the calling of a particular person."  *Id*.

23         Defendant Kintner states in his declaration offered in support of defendants' summary

24   judgment motion that he did not believe the witnesses proposed by plaintiff were necessary for him

25

26   REPORT AND RECOMMENDATION
     PAGE - 12

1   to determine plaintiff's guilt or innocence regarding the violations.  However, defendant Kintner

2   does not explain *why* he concluded those witnesses were unnecessary; he does not base his decision,

3   for example, on the safety concerns emphasized by the Supreme Court in *Wolff*.

4          It appears from plaintiff's complaint that the witness testimony which he sought to present at

5   his hearing was evidence regarding his mental state at the time the incident took place.  It further

6   appears that such testimony would have been relevant in some fashion to plaintiff's proceedings.

7   Included in the record is a copy of a Disciplinary Checklist and Statement which was completed, in

8   part, by defendant Kintner.  (Dkt. No. 68, Ex. 2 at 10.)  It appears from that document that one of the

9   determinations defendant Kintner was required to make was whether plaintiff was able to control his

10  behavior at the time of the infraction.  (*Id.*)  Plaintiff appears to contend that he could not control his

11  behavior at the time of the infraction, and that defendant Kintner precluded him from presenting

12  evidence to support this contention.

13         Because the testimony plaintiff sought to offer at his disciplinary hearing was  apparently

14  relevant to those proceedings, and because defendant Kintner fails to explain why he believes the

15  witnesses were unnecessary or how the calling of the witnesses would have been "unduly hazardous

16  to institutional safety and correctional concerns," there is a substantial question as to whether

17  plaintiff was, in fact, afforded the process he was due at his disciplinary hearing.  Accordingly,

18  summary judgment should be denied as to this claim.

19         With respect to defendant Belt, defendants argue that plaintiff's claims against her should be

20  dismissed because she considered plaintiff's appeal and made her decision in a timely manner, and

21  based upon the totality of the evidence.  Because there is a question as to what the "totality of the

22  evidence" should have been comprised of, and because defendant Belt rendered her decision with the

23  apparent knowledge that plaintiff had not been permitted to call witnesses, it appears that there is also

24  a substantial question as to whether plaintiff was afforded the process he was due in the appeal

25

26  REPORT AND RECOMMENDATION
    PAGE - 13

1    process.  Thus, defendants' motion for summary judgment should be denied with respect to this

2    claim as well.

3                                        Qualified Immunity

4            Defendants argue in their summary judgment motion that even if plaintiff has established a

5    violation of his constitutional rights, they are entitled to qualified immunity.  Qualified immunity

6    protects § 1983 defendants performing discretionary functions from liability for civil damages so

7    long as their conduct does not violate a clearly established constitutional or statutory right of which a

8    reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

9            In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court clarified the test to be applied in

10   evaluating claims of qualified immunity.  The threshold inquiry in a qualified immunity analysis is

11   whether the facts alleged, when taken in the light most favorable to the party asserting the injury,

12   show that the defendant's conduct violated a constitutional right.  *Id*. at 201.  If the reviewing court

13   concludes that no constitutional right was violated by the defendant's conduct, the court need not

14   inquire further.  *Id*.  However, if the reviewing court concludes that a constitutional right was

15   violated, the court must then determine whether the right was clearly established.  *Id*.  And, "[t]he

16   relevant, dispositive inquiry in determining whether a right is clearly established is whether it would

17   be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at

18   202.

19           As to defendants Hobdy and Nanson, this Court concludes that plaintiff has not established

20   that these defendants violated any constitutional right.  Accordingly, the Court need not undertake

21   the qualified immunity analysis as to these two defendants.  However, as to the remaining

22   defendants, this Court has concluded that substantial questions exist as to whether the conduct of

23   those defendants violated plaintiff constitutional rights and, thus, qualified immunity remains in play.

24   A review of the case law relevant to plaintiff's excessive force and due process claims satisfies this

25

26   REPORT AND RECOMMENDATION
     PAGE - 14

1   Court that the law as to the rights at issue was clearly established.  In this Court's view, it should

2   have been clear to reasonable officers, both in the context of plaintiff's excessive force claim and in

3   the context of his due process claim, what the constitutional parameters were and, thus, what conduct

4   was and was not lawful.  Accordingly, none of the defendants are entitled to qualified immunity in

5   this action.

6                                              <u>CONCLUSION</u>

7          For the foregoing reasons, this Court recommends that defendants' motion for summary

8   judgment be granted with respect to plaintiff's inadequate medical care claim and with respect to

9   plaintiff's claim that defendant Jones violated his constitutional rights when she directed transporting

10  officers to escort him backwards.  This Court further recommends that defendants' motion for

11  summary judgment be denied with respect to plaintiff's claim that defendant Jones used excessive

12  force when she pepper-sprayed him, and with respect to plaintiff's due process claims.  A proposed

13  order accompanies this Report and Recommendation.

14         DATED this 6th day of June, 2006.

15

16

17  _____

18  MONICA J. BENTON
    United States Magistrate Judge

19

20

21

22

23

24

25

26  REPORT AND RECOMMENDATION
    PAGE - 15